An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-941

Filed 3 June 2026

Alamance County, Nos. 23JA000176-000, 23JA000177-000

IN THE MATTER OF: D.M.D., and K.W.D.

Appeal by Respondent-mother and Respondent-father from orders entered 12 June 2025 by Judge Frederick B. Wilkins in Alamance County District Court. Heard in the Court of Appeals 20 May 2026.

> *Ewing Law Firm, P.C., by Robert W. Ewing, for respondent-appellant mother.*
>
> *Parent Defender Annick Lenior-Peek, by Assistant Parent Defender Benjamin J. Kull, for respondent-appellant father.*
>
> *Jamie L. Hamlett for petitioner-appellee Alamance County Department of Social Services.*
>
> *NC GAL Staff Counsel Michelle FormyDuval Lynch for guardian ad litem.*

WOOD, Judge.

Respondent-Father ("Father") and Respondent-Mother ("Mother") appeal from the trial court's order terminating both parents' parental rights to K.W.D. ("Kevin") and D.M.D. ("David").[1]  Both parents argue the trial court erred in finding grounds exist under N.C. Gen. Stat. § 7B-1111(a) to terminate their parental rights.  For the reasons set forth below, we affirm the trial court's termination of Mother's and Father's parental rights.

## I.    Factual and Procedural Background

Kevin was born 1 November 2022.  On 3 November 2022, Alamance County Department of Social Services ("DSS") received a report alleging neglect due to the fact both Kevin and Mother tested positive for cocaine and marijuana at his birth.  Mother reported she had five other children living with family in Connecticut but had limited support in North Carolina.  A safety plan was established with the paternal grandmother providing support and the family began receiving in-home services.  Custody remained with the parents.  However, DSS stated the "parents needed to obtain mental health and substance abuse assessments and follow recommendations, develop parenting skills and the mother needs viable/stable housing and income."  DSS also became aware that significant conflict existed between the parents.  Mother "reported verbal domestic violence and control dynamics by the father" and a social

---

[1] Pseudonyms are used to protect the identity of the juveniles pursuant to N.C. R. App. P. 42(b).

worker observed arguing. Parents completed one parenting class, which resulted in a recommendation for couples' counseling.

In July 2023, the temporary safety plan was dissolved. Kevin was living at home, and Father was designated the primary caregiver.

On 11 October 2023, Mother gave birth to David. On 17 October 2023, DSS received another report alleging neglect as both Mother and baby tested positive for cocaine and marijuana. In addition, David tested positive for benzodiazepines and opiates. During the family's stay in the hospital for David's birth, hospital security intervened in the ongoing conflict between Mother and Father.

After receiving the 17 October report, a Child and Family team meeting was held. At the meeting Mother and Father became verbally hostile to the DSS social worker, denied substance use, and did not have an alternative plan for the children. After the meeting, DSS filed petitions alleging both Kevin and David were neglected and dependent. DSS obtained a non-secure custody order and took custody of both boys that same day.

The petitions came on for hearing 21 February 2024. The trial court adjudicated the boys neglected and dependent and continued custody with DSS. The boys were placed in a foster home. Both parents were ordered to engage with DSS in order to make progress towards reunification. Mother was ordered to: develop a sufficient source of income to support herself and the children's basic needs, provide a safe and appropriate home environment, refrain from allowing mental health or

substance abuse to impact her parenting by completing a mental health and substance abuse assessment and implementing strategies, attend a domestic violence program and have a home free of domestic violence and chaos/discord, refrain from illegal activities, demonstrate age appropriate discipline and parenting skills by attending a parenting program and implementing strategies during visitation, demonstrate the ability to ensure the children's medical needs are met, and provide a reasonable portion of the cost of care for the children. Father was ordered to: develop a sufficient source of income to support himself and develop a budget, provide a safe and appropriate home environment, refrain from allowing mental health or substance abuse to impact his parenting by completing a mental health and substance abuse assessment and implement strategies, attend a domestic violence program and have a home free of domestic violence and chaos/discord, demonstrate age appropriate discipline and parenting skills, demonstrate the ability to ensure the children's medical needs are met, and provide a reasonable portion of the cost of care for the children.

On 17 July 2024, a permanency planning hearing was held. The trial court noted that Mother was not making adequate progress towards reunification and Father was making some progress but continued to act in a manner inconsistent with the health and safety of the children. Mother had not secured housing and continued in a relationship with Father, which she said was improving. However, social workers observed noticeable bruises on Mother, and a co-worker of Mother's had

called police to request a well check due to abuse concerns. Additionally, Mother had completed a comprehensive clinical assessment ("CCA") which recommended outpatient therapy and peer services. Mother did not follow through with any recommended services and tested positive for cocaine on 17 April 2024. The trial court found Mother had completed a four-hour on-line parenting class.

Similarly, Father had not secured his own housing but was living at his sister's home, in hotel rooms, and sometimes in a car. He had not gained employment but was receiving social security disability. He had been purchasing diapers and wipes for the boys. The trial court further noted that on 17 February 2024, police found 1.5 grams of marijuana and 0.6 grams of crack cocaine in his possession during a traffic stop, and he was driving without a license. Father agreed to a plea deal and received twelve months of supervised probation.

The trial court noted Father had completed a mental health and substance abuse assessment and based on his responses, no immediate recommendations were given. Father was adamant he had completed everything in his case plan, but he had continued to be hostile to DSS caseworkers on numerous occasions. The DSS social worker testified when they reached out to the domestic violence class instructor, he reported Father had not been consistent with attendance and had missed almost half of the sessions. The instructor reported he was unable to observe Father utilize any skills he had learned due to his poor attendance and, if Father did not have an open case with DSS, he already would have been released from the program. The trial

court found Father had completed a four-hour on-line parenting class. The trial court continued the plan of reunification.

On 4 December 2024, the trial court conducted another permanency planning hearing. The trial court found that neither Father nor Mother was making adequate progress towards reunification. During a meeting with DSS on 18 September 2024, Mother disclosed she was twenty-three weeks pregnant. Also, during the same meeting DSS observed an incident between Mother and Father. They noted Mother frequently covered bruises with makeup and that Father would break Mother's phones to control her communication. The DSS social worker also testified that on multiple occasions, Father raised his voice and became aggressive with DSS social workers. Mother and Father still did not have stable housing. Father had provided DSS with proof of an apartment and utility bills; however, the apartment lease was in the name of someone who had given him permission to reside there. When DSS social workers attempted to locate the parents, they were unable to establish exactly where Father and Mother were living, but it appeared they were together. Father also misled social workers about his location at various times, refused rides to drug testing, and became frustrated when the foster parent requested more diapers. The DSS social worker also testified that Mother was lying about employment, had not completed a domestic violence curriculum, and had tested negative on some drug tests but refused others.

The trial court changed the primary plan to adoption and made reunification the secondary plan. Additionally, DSS noted medical concerns with David that included a possible genetic condition. DSS requested and the trial court ordered Father to take a paternity test to provide genetic information to support David's care.

After the 4 December hearing, Mother enrolled in a residential substance abuse treatment program called Cascades in Charolotte, North Carolina. During the telephone intake Mother indicated that she was currently using marijuana and suboxone and there was a past and present issue of domestic violence. She asked Rebecca Kefer ("Kefer"), the DSS social worker, if she could give her a ride to Charlotte. She provided Father's address as the location to pick her up on 12 December. Father attempted to call Mother on the way to the program, but her phone was off, so he called Kefer multiple times. Mother also reported that she and Father had argued while she was packing and he had thrown all her shirts away.

On 15 December, three days after her check-in to the treatment center, Mother tested positive for THC and cocaine. She also reported she had been with Father for four years but there had been domestic violence for only the last two years.

Kefer attempted to stay in contact with Mother while she was in treatment; however, Mother rarely responded and communication with her was difficult.

Mother gave birth to their third child, Kimberly, on 30 December 2024 by a scheduled c-section. At the time of delivery, Mother tested positive for Hepatitis C and Strep B. Kimberly's urine did not test positive for any illicit substances, but her

meconium was sent for testing. It was negative for amphetamines, opiates, and oxycodone but there was not enough of the sample to test for cocaine, THC, or benzodiazepines. However, medical records indicated Kimberly was affected by maternal use of cannabis, opiates, and tobacco since Mother tested positive multiple times during pregnancy. Father was present at Kimberly's birth and cut the umbilical cord. He also visited Mother in the hospital several times.

Mother did not inform DSS when Kimberly was born. The boys' foster mother informed DSS on 31 December Kimberly had been born. Kefer reached out to Mother but received no response. The care manager from Atrium Health, the hospital where Kimberly was born, reached out to DSS on 31 December with questions but could not give DSS any information because Mother had instructed hospital staff that they were not allowed to release information to DSS. When Kefer contacted Father, he stated he did not know anything about the birth even though he had been present.

On 3 January 2025, DSS filed a petition alleging Kimberly was a neglected juvenile in that she did not have proper care or supervision and lived in an injurious environment. DSS sought and received nonsecure custody of Kimberly.

A non-secure custody hearing was held on 8 January 2025. The trial court continued non-secure custody with DSS but allowed DSS to place Kimberly with Mother at the treatment facility as long as Mother complied with treatment and DSS facilitated interactions between Kimberly and Father.

On 7 February 2025, DSS filed a Motion to Terminate Parental Rights to Kevin and David. DSS alleged grounds to terminate were neglect, willfully leaving the children in foster care for more than twelve months without showing reasonable progress to correct the conditions that led to removal, willful failure to pay a reasonable portion of the cost of care, and dependency in regards to Mother. The allegations regarding Father were similar but did not include dependency.

On 1 April 2025, DSS filed a motion to establish paternity. Father submitted to paternity testing. The results indicated there was 99.99% chance that David was Father's biological child but 00.00% chance Kevin was his biological child. Consequently, DSS moved to remove Father from Kevin's termination case.

On 7 and 8 May 2025, the trial court conducted a hearing on the petitions for termination of parental rights to Kevin and David and the adjudication for Kimberly. Because Paternity Test results indicated there was a 0.00% chance that Kevin was Father's biological child, the trial court ordered Father be removed as a party from the termination regarding Kevin and proceeded with the termination of Father's parental rights to David.

During adjudication of the termination of parental rights, the trial court heard testimony from Kefer; Vinneshia Covington ("Covington"), Mother's manager when she worked at Hardee's; Linette Myers ("Myers") a friend of Mother and foster mother for the boys; and Tabitha Brown ("Brown"), another DSS employee. The trial court found grounds existed to terminate both parents' parental rights based on each

ground alleged by DSS. The trial court then proceeded to disposition. Kefer, Myers, and Brown provided additional testimony. Mother, Father, and the children's guardian *ad litem* also testified. The trial court found it was in David's best interest to terminate Mother's and Father's parental rights and in Kevin's best interest to terminate Mother's parental rights.

The trial court filed the termination of parental rights orders on 12 June 2025. Mother and Father entered notice of appeal on 8 July 2025 and 11 July 2025, respectively.

## II.    Analysis

On appeal Mother and Father argue the trial court erred in finding grounds to terminate their parental rights. Father contends the trial court erred because the trial court failed to establish a causal connection between Father's "anger" and his ability to parent sufficient to warrant termination under N.C. Gen. Stat. § 7B-1111(a)(1) and (2), and Father did not willfully fail to contribute to the cost of care under N.C. Gen. Stat. § 7B-1111(a)(3) when he chose one of the two payment options provided by the trial court. Mother contends the trial court erred by (1) finding Mother was incapable of providing care under N.C. Gen. Stat. § 7B-1111(a)(6) because Mother had appropriate child care arrangements, (2) concluding Mother willfully failed to pay a reasonable portion of the cost of care when she was complying with her court ordered case service plan by attending a residential drug treatment program that did not permit her to work, and (3) concluding grounds existed under N.C. Gen.

Stat. § 7B-1111(a)(1) and (2) when she had eliminated the likelihood of future neglect by correcting the conditions that led to the children's removal from the home. We disagree.

**A. Standard of Review**

> Our Juvenile Code provides for a two-step process for termination of parental rights proceedings consisting of an adjudicatory stage and a dispositional stage. At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes.

*In re I.J.W.*, 378 N.C. 17, 21, 859 S.E.2d 148, 151 (2021) (internal quotations and citation omitted). "If the trial court finds that grounds exist for termination, it then proceeds to the dispositional stage at which it must 'determine whether terminating the parent's rights is in the juvenile's best interest[.]'" *In re E.H.P.*, 372 N.C. 388, 391–92, 831 S.E.2d 49, 52 (2019) (quoting N.C. Gen. Stat. § 7B-1110(a)). Here, parents appeal only the adjudication.

"We review a trial court's adjudication under N.C. [Gen. Stat.] § 7B-1109 to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law. The trial court's conclusions of law are reviewable de novo on appeal." *In re Z.A.M.*, 374 N.C. 88, 94, 839 S.E.2d 792, 797 (2020) (quoting *In re C.B.C.*, 373 N.C. 16, 19, 832 S.E.2d 692, 695 (2019)).

**B. Grounds for Termination**

The trial court may terminate a parent's parental rights if, "[t]he parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile." N.C. Gen. Stat. § 7B-1111(a)(2).

The first statutory element of N.C. Gen. Stat. § 7B-1111(a)(2) is met when the children have been in foster care for more than twelve months. Neither parent contests that the boys entered care on 17 October 2023 and had remained in care over eighteen months at the time of the termination hearing on 7 May 2025. The second element is willfulness. "Willfulness is established when the respondent had the ability to show reasonable progress, but was unwilling to make the effort. A finding of willfulness is not precluded even if the respondent has made some efforts to regain custody of the children." *In re O.C.*, 171 N.C. App. 457, 465, 615 S.E.2d 391, 396 (2005) (cleaned up). "Similarly, a parent's prolonged inability to improve his or her situation, despite some efforts and good intentions, will support a conclusion of lack of reasonable progress." *In re K.J.D.*, 297 N.C. App. 49, 53, 909 S.E.2d 795, 800 (2024) (quoting *In re C.M.S.*, 184 N.C. App. 488, 494, 646 S.E.2d 592, 596 (2007)).

> Our Supreme Court has held "that parental compliance with a judicially adopted case plan is relevant in determining whether grounds for termination exist pursuant to N.C.G.S. § 7B-1111(a)(2) provided that the objectives sought to be achieved by the case plan provision in question address issues that contributed to causing the problematic circumstances that led to the juvenile's

removal from the parental home."

*In re K.J.D.*, 297 N.C. App. at 53, 909 S.E.2d at 800 (quoting *In re T.M.L.*, 377 N.C.

369, 379, 856 S.E.2d 785, 793 (2021)).

**1. Father's Argument**

Father challenges two findings of fact, 79 and 112, and argues that his progress

on his case plan refutes the conclusion that he failed to make reasonable progress in

correcting the conditions that led to removal. However, "[i]n a nonjury proceeding

such as this, the findings of fact 'are conclusive on appeal when supported by any

competent evidence, even if the evidence could sustain contrary findings.'" *In re C.M.*,

273 N.C. App. 427, 430, 848 S.E.2d 749, 752 (2020), *aff'd sub nom. In re C.M.*, 377

N.C. 105, 856 S.E.2d 96 (2021) (quoting *In re Norris*, 65 N.C. App. 269, 275, 310

S.E.2d 25, 29 (1983)).

> [I]t is within the trial court's discretion to determine the weight and credibility that should be given to all evidence that is presented during the trial. A trial judge "passes upon the credibility of the witnesses and the weight to be given their testimony and the reasonable inferences to be drawn therefrom."

*In re K.W.*, 282 N.C. App. 283, 290, 871 S.E.2d 146, 152 (2022) (quoting *Phelps v.*

*Phelps*, 337 N.C. 344, 357, 466 S.E.2d 17, 25 (1994)). Additionally, "[t]he trial court

must itself determine what pertinent facts are actually established by the evidence

before it, and it is not for an appellate court to determine *de novo* the weight and

credibility to be given to evidence disclosed by the record on appeal." *Id.* (quoting *Coble v. Coble*, 300 N.C. 708, 712-13, 268 S.E.2d 185, 189 (1980)).

Finding of fact 79 states, "It was determined that [Father] is abusive to his partner (the mother in this case) in front of children by calling her names and arguing." Father contends this finding was made in response to the social workers' testimony, but her testimony does not support such a finding. We disagree. At no point does the trial court limit its finding to the social worker's testimony. Multiple witnesses gave extensive testimony regarding Father's behavior toward Mother. Myers, the boys' foster mother, testified that she observed Father yell and swear at Mother in front of the boys. Social worker Kefer testified that Father called Mother a "bitch" in front of at least one of the boys and that Mother reported both past and present domestic violence when she was admitted to Cascade in December 2024 and again at the assessment in January 2025. We hold there is ample clear, cogent and convincing evidence that supports finding of fact 79.

Finding of fact 112 states, "[Kevin] has some issues and behaviors that appear to be the result of being exposed to this chaotic and unhealthy relationship between the parents. [David] is less impacted because he was removed at such a young age." Father contends finding of fact 112 was based on "vague speculation" and there is no clear and convincing evidence of causation for Kevin's behaviors. However, Myers testified that when Kevin initially came into her care he was "fighting at daycare"

and that after visits with his parents "[Kevin] will hit his brother." We hold this testimony constitutes competent evidence to support the finding.

As the two contested findings are supported by competent evidence and the other 146 uncontested adjudicatory findings of fact are binding on appeal we now consider whether the findings of fact support the conclusion that Father willfully failed to make reasonable progress in correcting the conditions which led to removal. *In re J.M.*, 384 N.C. 584, 591, 887 S.E.2d 823, 828 (2023).

The boys were removed from the home due to concerns with drug use, mental health, domestic violence, and a lack of housing. In order to work towards reunification, the trial court ordered Father to: 1) develop a sufficient source of income to support himself and develop a budget, 2) provide a safe and appropriate home environment, 3) refrain from allowing mental health or substance abuse to impact his parenting by completing a mental health and substance abuse assessment and implement strategies, 4) attend a domestic violence program and have a home free of domestic violence and chaos/discord, 5) demonstrate age appropriate discipline and parenting skills, 6) demonstrate the ability to ensure the children's medical needs are met, and 7) provide a reasonable portion of the cost of care for the children. Regarding Father's progress in his case plan, the trial court's findings include, in pertinent part,

> 39. . . . When SW Kefer reached out to [Father], he lied saying he did not know if the baby was born. However, he was present at the hospital with the mother. The mother

informed [Father] when the child would be born.

46. The conduct the mother reported on February 6, 2024 continues to the present day. On December 4, 2024, the father told the mother she could not come back to their home during a court hearing. On December 12, 2024, the father threw the mother's shirts away when she was leaving for treatment. While the mother and SW Kefer were traveling to Charlotte to enroll the mother in treatment, [Father] called SW Kefer when the mother would not answer her own phone to check in. When the mother visits with the boys for two hours once a month, the father calls or has the mother call him. The mother continues to [be] financially dependent on the father. These patterns of conduct created and continue to create a risk of harm to the mother and, therefore, to the children if with the mother.

50. On December 4, 2024, the mother sought services through Family Abuse Services. She reported that [Father] threatened her and there was domestic and/or family violence and property destruction.

62. [Father] would come to Hardee's and try to intimidate the mother when she was waiting on male customers.

76. [Father] enrolled in the domestic abusers group in January of 2024. During his assessment, [Father] [made] light of arguments with his partners. [Father] reported that he has slapped, screamed at a partner but said partner is not afraid.

81. [Father's] absences extended the time he had to attend the [domestic abuser's] group. The group is twenty-six sessions. By missing approximately nineteen sessions, the program took about twice as long as it should have.

82. On January 27, 2025, [Father] completed his exit interview. During the interview, he reported no problems or concerns, successfully completed [the] quiz, stated he has been non-violent and non-abusive. [Father] stated he learned a lot. [Father] did not report kicking [Mother] out

of the shared home on December 4, 2024 or throwing her clothing away on December 12, 2024. [Father] did not report the domestic violence tendencies or control tactics observed by Hardee's employees. [Father] did not report his ongoing difficulties managing his behaviors with social work staff or arguing with the social worker in front of the children.

96. Prior to the hearing, [Father] approached the Hardee's manager and attempted to discuss her testimony. The Hardee's manager reported this to Program Manager Brown.

97. After the Hardee's manager finished testifying, [Father] called her a b.tch under his breath. He then followed her out of the courtroom. Program Manager Brown was concerned about the safety of the witness so she notified the bailiff.

113. [Father's] anger and general affect hostile demeanor is very apparent in his interactions with the social workers and other service providers. SW Mapp-Wade has observed [Father] becoming upset with [Mother] during a visit on September 18, 2024.

142. When social work staff try to redirect concerning behaviors, [Father] becomes defensive and angry with the social worker. He will tell SE Kefer things like karma is going to get you or you don't have children or you can't tell me how to parent my kids. These outbursts can be over minor issues such as telling [Father] not to give the young children hard candy.

144. Although [Father] has participated in many activities, he has failed to consistently and meaningfully demonstrated what is taught. His anger creates an injurious environment and substantial likelihood of repetition of neglect.

These findings clearly support the trial court's conclusion that although Father

may have participated in activities consistent with his court ordered plan and

improved his housing and drug use, he still had not made the necessary progress to correct one of the most important issues for which the boys were removed, domestic violence. "'[A] case plan is not just a checklist,' and parents are 'required to demonstrate acknowledgment and understanding of why the juvenile entered DSS custody as well as changed behaviors.'" *In re J.M.V.*, 296 N.C. App. 374, 387, 909 S.E.2d 347, 357 (2024) (quoting *In re R.L.R.*, 381 N.C. 863, 875, 874 S.E.2d 579, 589 (2022)). During his exit interview after a year of domestic violence classes, Father failed to acknowledge or understand his domestic violence behaviors. Additionally, he continued to lie to social workers and providers and display domestic violence behaviors towards Mother as well as hostility to DSS social workers and staff. He even continued to act out in anger during the termination proceedings when he cursed at and attempted to follow one of DSS' witnesses.

Father clearly failed to demonstrate an understanding of the detrimental impact his anger and violence have on the children. Here, the trial court's findings sufficiently support its conclusion that grounds exist to terminate Father's parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(2).

Because "a single ground for terminating parental rights is sufficient to support a termination order, this Court can uphold the trial court's order based on one ground without reviewing any remaining ground." *In re C.K.I.*, 379 N.C. 207, 210, 864 S.E.2d 323, 326 (2021). Thus, we do not address Father's other arguments.

**2. Mother's Arguments**

Mother does not contest any of the trial court's findings of fact. Therefore, the 148 uncontested findings are binding on appeal. *In re J.M.*, 384 N.C. at 591, 887 S.E.2d at 828. Rather, Mother argues the trial court's findings do not support the conclusion that she failed to make reasonable progress because she enrolled in Cascades, a residential treatment center, and has actively participated in the treatment program. We applaud Mother's commitment to the Cascades program and acknowledge what an incredible difference sobriety can make for Mother and her children. However, we cannot dismiss the findings of fact from which the trial court concluded Mother had failed to make reasonable progress.

The children entered DSS custody on 17 October 2023 due to concerns with drug use, mental health, domestic violence, and a lack of housing. In order to reunify with the children, Mother was ordered to 1) develop a sufficient source of income to support herself and the children's basic needs, 2) provide a safe and appropriate home environment, 3) refrain from allowing mental health or substance abuse to impact her parenting by completing a mental health and substance abuse assessment and implement strategies, 4) attend a domestic violence program and have a home free of domestic violence and chaos/discord, 5) refrain from illegal activities, 6) demonstrate age appropriate discipline and parenting skills by attending a parenting program and implementing strategies during visitation, 7) demonstrate the ability to ensure the

children's medical needs are met, and 8) provide a reasonable portion of the cost of care for the children.

At the permanency planning hearing conducted on 4 December 2024, the trial court changed the permanent plan from reunification to adoption after determining Mother had made no progress toward reunification and the children had been in DSS custody for more than twelve months. Mother was still using drugs and continuing to use drugs while pregnant. Mother still resided with Father even though she reported continuing domestic violence. She had lied to DSS social workers about her employment status and did not have separate housing from Father. After more than a year, she had made no marked progress in correcting the conditions which led to her children's removal.

Additionally, even after entering the residential treatment program at Cascades and receiving treatment for her drug addiction, she continued to maintain a relationship with Father. The trial court found

> [Mother] has not demonstrated her ability to stay clear of relationships with domestic violence. She has reported her relationship with [Father] to be co-parenting only. However, she acknowledges talking with him daily. At the end of conversations, she tells [Father] she loves him. She is [a]ware of his ongoing anger issues but defends him, stating that he is trying.

Mother's visitation with her sons was significantly limited yet she chose to call Father during her visits. She also facilitated contact between Kimberly and Father in violation of the trial court's order for DSS to facilitate all contact between Father and

Kimberly. Mother's continued engagement with Father despite his continued abusive behavior is competent evidence that even when in residential care with housing, food and support provided, Mother still had not addressed domestic violence, one of the primary reasons the children were removed from the home.

Our Supreme Court has held that "last-minute attempts" made after DSS files petitions to terminate are "insufficient to constitute reasonable progress under N.C. [Gen. Stat.] § 7B-1111(a)(2)." *In re T.M.L.*, 377 N.C. 369, 380, 856 S.E.2d 785, 793 (2021). Further, "'a trial court has ample authority to determine that a parent's extremely limited progress in correcting the conditions leading to removal adequately supports a determination that a parent's parental rights in a particular child are subject to termination pursuant to N.C. [Gen. Stat.] § 7B-1111(a)(2).'" *In re A.S.D.*, 378 N.C. 425, 434, 861 S.E.2d 875, 882-83 (2021) (quoting *In re B.O.A.*, 372 N.C. 372, 385, 831 S.E.2d 305, 314 (2019)).

Here, the trial court's findings sufficiently support its conclusion that grounds existed to terminate Mother's parental rights under N.C. Gen. Stat. § 7B-1111(a)(2) because Mother failed to make any significant progress in correcting the conditions that led to the children's removal and the children had been in care for over a year when the petitions were filed. Mother did not begin making any significant progress until after DSS filed the petitions to terminate. She entered the Cascades inpatient treatment program; however, even with the support of the Cascades program Mother still had not made progress with domestic violence issues, in that she continued in a

relationship with Father fraught with domestic violence. Despite Mother's progress on her case plan, she failed to correct the conditions that led to the removal of the children.

Because "a finding of only one ground is necessary to support a termination of parental rights," we only need address one of the parents' arguments. *In re A.R.A.*, 373 N.C. 190, 194, 835 S.E.2d 417, 421 (2019). Therefore, we do not address Mother's additional arguments.

## III. Conclusion

For the foregoing reasons, we affirm the trial court's order terminating Mother's parental rights to her sons, Kevin and David, and terminating Father's parental rights to his son, David.

AFFIRMED.

Judges COLLINS and FLOOD concur.

Report per Rule 30(e).